# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-3183

_____

United States of America

*Plaintiff - Appellee*

v.

Gilberto Baldenegro-Valdez

*Defendant - Appellant*

_____

No. 11-3581

_____

United States of America

*Plaintiff - Appellee*

v.

Juan Francisco Rodriguez-Guerra, also known as Felipe Camarena

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: June 13, 2012
Filed: January 16, 2013

_____

Before BYE, BEAM, and SMITH, Circuit Judges.

_____

BEAM, Circuit Judge.

Gilberto Baldenegro-Valdez and Juan Rodriguez-Guerra (also known as Felipe Camarena) (collectively, "defendants") appeal their convictions, for conspiracy to distribute methamphetamine, following their joint jury trial. They assert several pretrial and trial errors. We affirm the district court.[1]

## I.    BACKGROUND

In March 2010, Franklin Espana, a suspect in a different methamphetamine conspiracy investigation than the one at issue here, spoke with FBI agents, offering information about a methamphetamine supplier in Kansas City, Camarena. Espana began helping the government and in that capacity, set up a controlled buy with Camarena. Espana, who was wearing a wire,[2] and Camarena agreed to meet at a Price Chopper grocery store in Independence, Missouri. When they met, another person accompanied Camarena, later identified as Baldenegro-Valdez. The parties proceeded to a nearby carwash to complete the transaction. The controlled-buy plan was for Espana to first purchase one ounce, and arrange for the purchase of another pound later the same day. During the one-ounce transaction, Camarena and Espana spoke out of earshot of Baldenegro-Valdez, and Espana understood Camarena to indicate that Baldenegro-Valdez was the source of the methamphetamine.

_____

[1]The Honorable Greg Kays, United States District Judge for the Western District of Missouri.

[2]An FBI agent assisting with this operation and listening to the conversations recorded by the wire was fluent in Spanish.

During the second, one-pound-buy transaction, Espana, Camarena and Baldenegro-Valdez met in one location (a Hardee's restaurant), then traveled to another location (a QuikTrip) in separate vehicles. At that locale, Camarena got into Espana's vehicle and followed the vehicle (a Taurus) Baldenegro-Valdez was then driving. Espana, who was still wearing a wire, signaled to law enforcement by using a predetermined word that he had seen the methamphetamine in Camarena's possession. Law enforcement soon stopped both vehicles. Espana got word to law enforcement where the methamphetamine was located in the car, and officers recovered 195.6954 grams of nearly pure methamphetamine from Espana's car. Officers determined before Espana left for the controlled buy that there were no drugs in Espana's car prior to the controlled buy. Camarena was arrested, he invoked his Miranda rights and he did not make a statement to law enforcement officers.

During the traffic stop of Baldenegro-Valdez's car, Baldenegro-Valdez produced a Mexican identification card, later determined to be a valid Mexican driver's license. Baldenegro-Valdez admitted he did not have a United States driver's license. The officer arrested Baldenegro-Valdez for not having a valid driver's license and placed him in the patrol car, but did not inform him of the drug investigation so as not to compromise the integrity of the investigation. At trial, on cross-examination, the arresting officer testified that he noticed Baldenegro-Valdez had a cracked windshield before stopping Baldenegro-Valdez's car, and the officer wrote a ticket for the cracked windshield. During an inventory search of the impounded vehicle, officers found approximately 12 grams of methamphetamine with the same level of purity as the methamphetamine found in Camarena's possession. Baldenegro-Valdez signed a rights waiver form and agreed to speak to officers. Although he told them different stories about the nature of his being in Kansas City, he eventually admitted that a man in Mexico named "Selvo" directed him to travel from Colorado to Kansas City to meet an individual he called "Plebe" (later determined to be Camarena). Baldenegro-Valdez admitted participating in five or six methamphetamine transactions, including the one-ounce controlled transaction earlier

that day involving Espana. When confronted with the information about the methamphetamine found in the other car, Baldenegro-Valdez implicated himself in this transaction as well, stating that Selvo was the original source and that Baldenegro-Valdez agreed to transport the methamphetamine from Colorado to Kansas City because he was broke.

Baldenegro-Valdez moved to suppress the evidence found in his car and the incriminating statements he made to police, arguing that the officers did not have probable cause to pull over his vehicle, that there was not probable cause to arrest him for having an invalid driver's license or a cracked windshield, and that officers conducted an improper warrantless search of the car. The district court rejected these arguments and refused to suppress the evidence and statements. Prior to trial, Baldenegro-Valdez also moved in limine attempting to exclude the methamphetamine found in his vehicle as well as several statements that he made while under surveillance and statements he made to police officers post-arrest. Baldenegro-Valdez also moved to exclude the English translations of the transcripts from the Spanish audio recordings. The district court refused to keep this evidence from the jury.

At defendants' joint trial, a primary point of contention between the government and defendants was the impeachment of Espana. Defendants wished to impeach Espana regarding the facts surrounding his narcotics convictions, ranges of punishment for the convictions, other uncharged drug activities, and the fact that Espana had lied to the police before he began cooperating. The district court ruled that cross-examination would be limited to the existence and nature of the convictions, the statutory range of punishment, and the benefit he expected to receive by cooperating and testifying. Also at trial, defendants requested specific jury instructions that were rejected by the district court. Camarena requested that the district court instruct the jury that it could consider Espana's prior convictions in evaluating Espana's credibility. Baldenegro-Valdez requested that the district court

-4-

instruct the jury about the possibility of a second uncharged conspiracy to account for the person referred to as "Plebe,"[3] and a specifically tailored "mere presence" instruction. The district court declined to give the proffered instructions. The jury convicted both defendants of the charged conspiracy.

On appeal, Camarena alleges the district court erred: (1) by limiting his Sixth Amendment right to cross-examine Espana; (2) by failing to give his proffered instruction regarding Espana's credibility; and because (3) the cumulative effect of these errors rendered his trial fundamentally unfair. Baldenegro-Valdez alleges the district court erred: (1) in denying his motion to suppress; (2) in making various evidentiary rulings, including the rulings on the motions in limine; (3) in refusing to grant a mistrial based upon Espana's alleged perjury, and based upon the prosecutor's inadvertent mention of the suppression hearing; (4) in violating his Sixth Amendment rights by limiting Espana's cross-examination; (5) in refusing to give his proffered jury instructions regarding an alleged second uncharged conspiracy and mere presence; and (6) in improperly limiting his closing argument.

## II.    Sixth Amendment

Defendants allege that their Sixth Amendment rights were violated when the district court limited the scope of their impeachment of Espana. The jury was informed of Espana's convictions for conspiracy to distribute methamphetamine and aiding and abetting the possession of 50 grams or more of methamphetamine, and the statutory range of punishment for both. The jury was also informed that Espana had a plea agreement with the government and was hoping to receive a reduced sentence on the charges in exchange for his cooperation. Both defendants declined to call

_____

[3]"Plebe" was identified with neutral pronouns during trial to avoid confusion, and to avoid the Sixth Amendment Confrontation Clause problem between jointly tried co-defendants identified in Bruton v. United States, 391 U.S. 123 (1968), as "Plebe" was apparently another of Camarena's nicknames or aliases.

Espana as part of their case-in-chief. Defendants challenge the district court's limitations on their cross-examinations.

The Sixth Amendment provides a criminal defendant the right to confront the witnesses against him. The primary purpose of this right is to guarantee the opportunity for effective cross-examination, particularly with respect to a witness's potential bias. Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986). However, courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id. at 679. A limitation on cross-examination does not violate the Sixth Amendment unless the defendant shows that a reasonable jury might have received a "significantly different impression" of the witness's credibility had defense counsel "been permitted to pursue his proposed line of cross-examination." Id. at 680. We review the district court's limitation of cross-examination of a witness for an abuse of discretion. United States v. Stroud, 673 F.3d 854, 860 (8th Cir. 2012).

While a witness may be impeached by inquiring into his prior convictions, we have previously limited the scope of such examination to avoid possible confusion resulting from the trial of collateral issues, and also to avoid unfairness to the witness. United States v. Street, 548 F.3d 618, 627 (8th Cir. 2008). In Street, the district court limited the defendant's questioning of a witness to establishing his prior convictions following a jury trial. We affirmed, reasoning that "[t]o inquire further and to contest the truthfulness of [the witness's] individual past statements would be to relitigate his prior conviction . . . precisely the sort of confusing, collateral issue" we seek to avoid. Id. Furthermore, we have established that the defense may cross-examine a cooperating witness in order to elicit the fact that the witness is hoping to please the government by testifying in order to receive a reduced sentence, but that it is generally not an abuse of discretion for the district court to limit counsel's technical

-6-

arguments about the specific applications of mandatory minimums or the sentencing guidelines. See, e.g., United States v. Walley, 567 F.3d 354, 360 (8th Cir. 2009) (holding there was no Sixth Amendment violation where the jury knew that without the government's sentencing motion, the defendant faced as "significant" sentence as opposed to a five-year mandatory minimum).

In the present case, defendants cross-examined Espana about the fact of his two convictions; the statutory range of punishments; the minimum and maximum punishment he faced; the fact that he had a plea agreement with the government; the fact that he hoped to receive a lesser sentence by cooperating with the government; and the fact that he could receive a sentence under the statutory minimum if the government filed the requisite motion. Consequently, defendants were able to fully cross-examine Espana on any potential bias or incentive for his testimony. Allowing them to cross-examine Espana about the purity of the methamphetamine he was arrested with in the unrelated conspiracy and other similar facts would have created a mini-trial on irrelevant collateral matters and risked confusing the jury. See Street, 548 F.3d at 627. Defendants were able to elicit for the jury that Espana faced a lengthy sentence (five to forty years) for his role in the conspiracy, and that he was hoping to get a sentence even lower than the five-year minimum by testifying. Given that the "touchstone of our inquiry" is whether defendants had an "adequate opportunity to impeach" Espana, we find that they did have such opportunity. United States v. Dale, 614 F.3d 942, 957 (8th Cir. 2010).

Defendants cite United States v. Caldwell, 88 F.3d 522 (8th Cir. 1996), in support of their arguments that the district court violated their Sixth Amendment rights by limiting cross-examination. In Caldwell we found that the district court abused its discretion by disallowing defense counsel to cross-examine a testifying witness about the ten-year mandatory minimum the witness would have faced had he not cooperated with the government by testifying. Id. at 525. We found that such evidence was accurate and relevant rather than collateral, but ultimately concluded

that the error was harmless beyond a reasonable doubt. Id. Caldwell is distinguishable because in it, the witness had already received the benefit of cooperation because the government had dismissed the charge with the mandatory minimum. Id. In this case, however, defendants were allowed to cross-examine Espana about whether he pleaded guilty and received a cooperation deal, and about the lower sentence he hoped to receive, including the possibility of a government departure motion. Given the complex nature of the government's charging decisions, plea bargains and the sentencing guidelines, it was not an abuse of the district court's discretion to limit the somewhat technical sentencing and charging arguments counsel sought to make, as well as Espana's receipt of a Kastigar[4] letter. See United States v. Jasso, No. 12-1158, 2012 WL 6097132, at *2-3 (8th Cir. Dec. 10, 2012) (holding there was no Sixth Amendment violation for refusing to allow cross-examination for bias regarding the somewhat complicated interplay between the witness's and the defendant's state and federal prosecutions). We are not persuaded that the jury would have had a "significantly different impression" of Espana's credibility had counsel been able to make the disallowed arguments, in addition to the arguments they were allowed to make. Van Arsdall, 475 U.S. at 680. Accordingly, the district court did not abuse its discretion in limiting Espana's cross-examination.

## III. Camarena

Camarena also contends the district court erred in failing to give his proffered jury instruction. Camarena proposed the following instruction based upon Eighth Circuit Model Criminal Instruction No. 2.18: "You have heard evidence that Franklin Espana was once convicted of a crime. You may use that evidence only to help you decide whether to believe the witness and how much weight to give his testimony."

_____

[4]Kastigar v. United States, 406 U.S. 441, 458-59 (1972) (upholding the constitutionality of compelled testimony over a Fifth Amendment challenge if the government has offered immunity commensurate with the protections of the Fifth Amendment).

Instead, the district court gave model instruction 4.05B, which, in pertinent part, was read to the jury by the court as follows:

> You have heard evidence that Franklin Espana hopes to receive a reduced sentence on criminal charges pending against him in return for his cooperation with the government in this case. Franklin Espana entered into a plea agreement with the government which provides that in return for his assistance, the government will file a motion for reduction in his sentence. . . . If such a motion for reduction of sentence for substantial assistance is filed by the government, then it is up to the judge to decide whether to reduce the sentence at all, and if so, how much to reduce it. You may give the testimony of this witness such weight as you think it deserves. Whether or not testimony of a witness . . . may have been influenced by his hope of receiving a reduced sentence is for you to decide.

As illustrated, the instruction actually given is lengthier, incorporates similar language to that in model instruction 2.18, and even further, informs the jury that it could consider whether the witness was influenced by hope of a reduced sentence. It does not explicitly state that Espana was "once convicted of a crime," but it states that he has criminal charges pending against him and that he has entered a plea agreement with the government. A district court should give instructions that correctly state the law and are supported by the evidence. United States v. Meads, 479 F.3d 598, 601 (8th Cir. 2007). Counsel is not entitled to one specific instruction over another if the instruction given was appropriate and covered the same ground that the rejected instruction would have covered. United States v. Brown, 478 F.3d 926, 928 (8th Cir. 2007). Given the district court's considerable discretion in this area, there was no abuse of that discretion. The instruction given, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issue of Espana's credibility to the jury. United States v. Payton, 636 F.3d 1027, 1040 (8th Cir.), cert. denied, 132 S. Ct. 349 (2011) .

Camarena's final argument is that the cumulative effect of the foregoing errors led to a violation of his Sixth Amendment rights. As our preceding discussion indicates, the district court did not commit error with regard to the first two issues. We may reverse on the basis of cumulative error only where the case as a whole presents an image of unfairness resulting in the deprivation of defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal. United States v. Montgomery, 635 F.3d 1074, 1099 (8th Cir.), cert. denied, 132 S. Ct. 1741 (2011). Camarena cannot meet this heavy burden, and we affirm his conviction.

## IV. Baldenegro-Valdez

### A. Motion to Suppress

Baldenegro-Valdez argues the district court erroneously denied his motion to suppress evidence obtained from the stop and search of the Taurus, including the statement he ultimately gave to the police. An investigatory stop does not violate the Fourth Amendment if the police have reasonable suspicion that the vehicle or its occupants are involved in criminal activity. United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999). In the instant case, the police had the requisite reasonable suspicion to stop the Taurus because police had observed that the same car, with Baldenegro-Valdez as an occupant, was involved in a controlled buy earlier the same day, and then the car was peripherally involved (by following Espana's car) in the scheduled second controlled buy that day. Though Camarena left the Taurus to ride with Espana, this does not negate the reasonable suspicion associated with the Taurus and its driver. The fact that the car was legally stopped, however, does not necessarily mean that Baldenegro-Valdez was validly arrested. Instead, probable cause to make a warrantless arrest only exists when "considering all the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect

has committed or is committing a crime." United States v. Parish, 606 F.3d 480, 486 (8th Cir. 2010) (quotation omitted).

The government concedes that Baldenegro-Valdez's arrest for having an improper driver's license was not a valid arrest, because his driver's license was actually valid in his native country, see Mo. Rev. Stat. § 302.080(3), but points out that Baldenegro-Valdez was written a ticket for having a cracked windshield, and a driver can be arrested for committing a traffic violation, no matter how minor. Virginia v. Moore, 553 U.S. 164, 171 (2008). In addition to the traffic violation, the district court also found that the police had legitimate reasons to believe that Baldenegro-Valdez was involved in criminal activity to support a finding of probable cause for his arrest. We agree with the district court that the officer had probable cause to arrest Baldenegro-Valdez, given that officers had observed Baldenegro-Valdez's participation in one completed, and one ongoing, controlled methamphetamine buy. See United States v. Chauncey, 420 F.3d 864, 871-72 (8th Cir. 2005) (holding that it was reasonable for officer to believe that the driver of a car with marijuana in plain view had committed or was committing a crime, and that there was probable cause for arrest, regardless of whether the officer intended to arrest the driver for a minor traffic violation). Because Baldenegro-Valdez's arrest was valid, and he was correctly given his Miranda warnings, which he waived, his post-arrest statements were properly admitted at trial.

Further, because Baldenegro-Valdez's arrest was constitutional, the search of the Taurus was a valid inventory search. In general, when taking custody of property such as a suspect's vehicle, law enforcement officers may conduct a warrantless search and inventory of the contents of the vehicle in order to protect the owner's property, to protect the police against claims of lost or stolen property, and to protect the police from potential danger. Colorado v. Bertine, 479 U.S. 367, 372 (1987). The central inquiry in determining whether such an inventory search is reasonable is a consideration of the totality of the circumstances. United States v. Marshall, 986 F.2d

-11-

1171, 1174 (8th Cir. 1993). To that end, "inventory searches conducted according to standardized police procedures, which vitiate concerns of an investigatory motive or excessive discretion, are reasonable." Id. Consequently, to be constitutional, "[a] warrantless inventory search must be done pursuant to standard police procedures and for the purpose of protecting the car and its contents." United States v. Best, 135 F.3d 1223, 1225 (8th Cir. 1998) (internal quotations omitted). In this case, the district court concluded that the inventory search of the Taurus was correctly performed pursuant to the Independence, Missouri, police department policy, because this was the entity responsible for towing the vehicle. Our review of the record indicates that this finding was not clearly erroneous. Baldenegro-Valdez's arguments about the Jackson County Drug Task force's inventory policies (or lack thereof) are inapposite, and his citation to United v. Taylor, 636 F.3d 461, 464 (8th Cir. 2011) (holding that inventory search was improperly conducted contrary to department procedures by not detailing the extensive tool collection in the defendant's truck) is distinguishable.

Even if the inventory search was not valid, the district court also found that the vehicle search was valid under the automobile exception. Given the involvement of this particular car in the previous controlled scenarios, known to the officers making the stop, we agree that the automobile exception could also vitiate the search at issue. See United States v. Hambrick, 630 F.3d 742, 747 (8th Cir.) (holding that officers have probable cause to search a vehicle under the automobile exception if they reasonably believe, based upon a reliable source, a fair probability exists that contraband would be found in a vehicle), cert. denied, 131 S. Ct. 2919 (2011). The arresting officers reasonably believed, based upon information obtained from the drug task force officers, that either drugs or the proceeds of the earlier drug transaction, would be found in the Taurus. Accordingly, the motion to suppress was properly denied.

**B.    Motion in Limine**

By way of a motion in limine, Baldenegro-Valdez sought to exclude: the methamphetamine found in the Taurus, statements made on the surveillance tapes about his prowess in bar fights, as well as his <u>Mirandized</u> statement about being involved in other methamphetamine transactions.  The latter two of these items Baldenegro-Valdez argued violate Federal Rule of Evidence 404(b).  Baldenegro-Valdez also argued in the motion in limine that the English translation of the recorded Spanish conversations should not have been admitted.  Our review of the district court's evidentiary rulings in limine is for an abuse of discretion.  <u>Street</u>, 548 F.3d at 624.

With regard to the methamphetamine and the <u>Mirandized</u> statements, when the motion to suppress was denied, the drugs and statement were admissible, relevant evidence at the methamphetamine conspiracy trial.  After admission, Baldenegro-Valdez was able to argue to the jury that he did not know anything about the methamphetamine in the Taurus, but the drugs were certainly admissible, relevant evidence.  Similarly, the statements Baldenegro-Valdez made about being present for earlier methamphetamine transactions that occurred during the conspiracy are not Rule 404(b) evidence; they are admissions directly linking him to the methamphetamine conspiracy for which he was on trial.  The district court appropriately refused to allow Baldenegro-Valdez a second bite at the apple following his failed suppression motion.

Nor did the district court abuse its discretion in refusing to exclude the "bar fight" statement under Rule 404(b).  The government did not offer it to show that Baldenegro-Valdez had engaged in other bad acts; it offered the statement to provide context for the meeting the three had to set up the second controlled buy.  <u>See</u> <u>United States v. Ruiz-Chavez</u>, 612 F.3d 983, 988 (8th Cir. 2010) (holding that evidence of prior wrongful conduct is considered contextual and admissible when offered for the

purpose of completing the story of the charged crime). And, the evidence was not highlighted–though it was admitted with the entire transcript of the recorded conversations, it was not played for the jury or mentioned during the government's closing argument. Therefore, any possible error in admitting the evidence was harmless.

Baldenegro-Valdez also asserts that the district court should have excluded, for lacking foundation and authentication, the government's proffered English translated transcripts of the recorded Spanish calls and conversations that occurred while Espana was wearing a wire. The government points out that it properly authenticated the documents with Espana's testimony, and also with expert testimony from a linguist regarding the substantive content of the translations. This satisfies the relatively low authentication burden under Federal Rule of Evidence 901(a). United States v. Watson, 650 F.3d 1084, 1090-91 (8th Cir. 2011). If Baldenegro-Valdez was concerned about the accuracy of the translations, he was free to offer his own version of the transcripts or otherwise challenge the government's verison. United States v. Gonzalez, 365 F.3d 656, 660 (8th Cir. 2004), vacated in part on other grounds by 543 U.S. 1107 (2005). He did not offer his own, and he was able to cross-examine the translator with regard to accuracy at trial. As the accuracy of the translations was a question for the jury to decide, United States v. Perez, 663 F.3d 387, 394 (8th Cir. 2011), we find the district court did not abuse its discretion in refusing to exclude the translations.

C.    Mistrial

Baldenegro-Valdez argues the district court should have granted a mistrial because Espana allegedly committed perjury, and because the prosecutor inadvertently used the phrase "suppression hearing" in referencing a transcript. We review the district court's refusal to grant a mistrial for an abuse of discretion. Street, 548 F.3d at 624.

As a threshold matter, Baldenegro-Valdez cannot establish that Espana testified falsely. Baldenegro-Valdez points to a portion of the transcript wherein Espana tells Camarena that he talked to Baldenegro-Valdez about not getting paid for a drug deal; and then at trial Espana confirmed that he told Camarena that Espana had talked to Camarena's friend (Baldenegro-Valdez) at the car wash. The government then confirmed[5] with Espana that Espana was claiming (to Camarena) that he (Espana) had spoken to Baldenegro-Valdez. The perjury allegation is based upon the fact that the recording of the transaction "conclusively demonstrates that at the car wash, Espana did not 'tell' Mr. Baldenegro-Valdez anything nor otherwise 'talk' to him." Appellant Baldenegro-Valdez's Opening Brief at 41. While the recording may indeed establish that Espana and Baldenegro-Valdez did not speak, we could not disagree more with Baldenegro-Valdez's assertion that this demonstrates Espana's perjured testimony. The only thing conclusively demonstrated by this portion of the trial transcript is that Espana likely lied to Camarena about whether he talked to Baldenegro-Valdez. Given that he was acting as an informant attempting to gather information and set up a drug deal for the benefit of the government, we hardly think this is remarkable. Further, and critically, Baldenegro-Valdez did not object at the time of this allegedly perjured testimony, nor did he cross-examine Baldenegro-Valdez about this supposed lie. Instead, on the next day of trial, Baldenegro-Valdez advanced his perjury theory and moved for a mistrial. The district court did not abuse its discretion in denying the motion.

---

[5]The transcript reads as follows:

Q. And when you said, "Look, I was telling your friend," what were you talking about there?
A. Oh, I was telling him that I had–before I got in the car was talking to his friend that was in the car wash with us, about this whole process that we're doing of buying methamphetamine.
Q. And that person you're referring to is the person who you identified earlier as Giberto Baldenegro-Valdez?
A. Yes.

The prosecutor's use of the words "suppression hearing" also did not require a mistrial. The prosecution's inadvertent use of the term, while examining a witness on redirect (after Baldenegro-Valdez introduced the suppression transcript to cross-examine the witness), was immaterial and not prejudicial. There was no reference to the content of the suppression hearing or the result. The trial court sustained Baldenegro-Valdez's objection and immediately gave a curative instruction to the jury to disregard the question. See United States v. Thomas, 93 F.3d 479, 487 (8th Cir. 1996) (holding no abuse of discretion for denying mistrial where reference to suppression hearing was brief, inadvertent, quickly corrected and curatively instructed). We presume that the jury will follow such admonitions. United States v. Farmer, 73 F.3d 836, 844 (8th Cir. 1996). This argument is without merit.

## D.     Jury Instructions

Baldenegro-Valdez argues that the district court should have given his proffered "mere presence" instruction. Baldenegro-Valdez's theory of defense was that he was not part of the conspiracy but simply present during Camarena's travels. He argued that in addition to the model "mere presence" instruction, the court should have added the language, "mere presence at the scene and knowledge that another is going to distribute a controlled substance" is not sufficient for a finding of guilt. Instead, the court gave the unchanged language of model instruction 5.06B which contains "mere presence" language, but did not personalize the instruction to a drug deal. Accordingly, the district court did not abuse its discretion in failing to give Baldenegro-Valdez's proffered instruction because the instruction it gave covered the bases. Payton, 636 F.3d at 1040.

Baldenegro-Valdez's final argument is that the district court should have instructed the jury about the possibility of a second conspiracy, based upon the references to the person known as "Plebe," who, as previously noted, was actually Camarena. The parties used a neutral pronoun in place of Plebe, and never clearly

explained to the jury who this person was in order to steer clear of any possible Bruton problems. However, because apparently Plebe and Camarena were the same person, regardless of what the jury knew, there was no actual evidence to support the existence of multiple conspiracies in this case. Accordingly, the district court did not err in refusing to give the instruction. United States v. Faulkner, 636 F.3d 1009, 1020 (8th Cir.) (holding no error in refusing to give multiple conspiracy instruction where it was not supported by evidence), cert. denied, 132 S. Ct. 761 (2011). Relatedly, Baldenegro-Valdez argues that he should have been allowed to argue to the jury that he was a participant in a second, uncharged methamphetamine conspiracy, and that the district court erred in not allowing this argument during closing argument. For the same reason that the instruction was not appropriate, the district court did not err in refusing to allow Baldenegro-Valdez to mislead the jury during closing argument. We affirm Baldenegro-Valdez's conviction.

_____